1  GREENBERG TRAURIG, LLP
   JEFF E. SCOTT (SBN 126308)
2  *ScottJ@gtlaw.com*
   VINCENT H. CHIEFFO (SBN 49069)
3  *ChieffoV@gtlaw.com*
   JORDAN D. GROTZINGER (SBN 190166)
4  *GrotzingerJ@gtlaw.com*
   REBEKAH S. GUYON (SBN 291037)
5  *GuyonR@gtlaw.com*
   1840 Century Park East, Suite 1900
6  Los Angeles, CA 90067-2121
7  Telephone:  310-586-7700; Facsimile:  310-586-7800

8  Attorneys for Defendants NBCUniversal Media, LLC,
   erroneously sued as "NBCUniversal, Inc.;" F. Gary Gray;
9  O'Shea Jackson Sr., p/k/a Ice Cube; Andre Young, p/k/a Dr.
   Dre; The Estate of Eric Wright, p/k/a Eazy E; Tomica Woods-
10 Wright, individually and as the personal representative of The
   Estate of Eric Wright; Comptown Records, Inc.; Matt Alvarez;
11 Scott Bernstein; Legendary Pictures Funding, LLC, erroneously
12 sued as "Legendary Pictures;" Xenon Pictures, Inc., sued as
   "Xenon Pictures, Inc./Xenon Entertainment Group;" Jonathan
13 Herman; Andrea Berloff; S. Leigh Savidge; and Alan Wenkus
14

15              UNITED STATES DISTRICT COURT

16       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

17

18  GERALD E. HELLER, an individual,    CASE NO. 2:15-cv-09631-MWF-KS

19              Plaintiff,              NOTICE OF MOTION AND MOTION TO
                                        STRIKE CLAIMS 1 THROUGH 8 OF THE
20  vs.                                 FIRST AMENDED COMPLAINT
                                        PURSUANT TO CAL. CIV. PROC. CODE §
21  NBCUNIVERSAL, INC., et al.,         425.16; MEMORANDUM OF POINTS AND
                                        AUTHORITIES
22              Defendants.
                                        [Chieffo Declaration and Request for Judicial
23                                      Notice Filed Concurrently]

24
                                        Date:         March 28, 2016
25                                      Time:         10:00 a.m.
26                                      Courtroom:    1600
                                        Action Removed:  December 15, 2015
27  ─────────────────────────────

28

*LA 132458351*

TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on March 28, 2016 at 10:00 a.m. in Courtroom 1600 of the above-captioned Court, located at 312 North Spring Street, Los Angeles, California, Defendants NBCUniversal Media, LLC, erroneously sued as "NBCUniversal, Inc.;" F. Gary Gray; O'Shea Jackson Sr., p/k/a Ice Cube; Andre Young, p/k/a Dr. Dre; Tomica Woods-Wright, individually and as the personal representative of The Estate of Eric Wright; Comptown Records, Inc.; Matt Alvarez; Scott Bernstein; Legendary Pictures Funding, LLC, erroneously sued as "Legendary Pictures;" Jonathan Herman; Andrea Berloff; S. Leigh Savidge; and Alan Wenkus (collectively "Defendants") will and hereby do move pursuant to Cal. Civ. Proc. Code § 425.16 (b) to dismiss Claims 1 through 8 of the First Amended Complaint ("FAC"). Defendants' Motion is made on the grounds that Claims 1 through 8 fall within the scope of speech and conduct protected by Cal. Civ. Proc. Code § 425.16, and Plaintiff cannot demonstrate a probability that he will prevail on the merits of his claims.

Defendants also seek an award of attorneys' fees against Plaintiff pursuant to Cal. Civ. Proc. Code §425.16(c). Defendants will submit a supporting declaration and motion for attorneys' fees should the instant Motion be granted.

This Motion is based on this Notice, the attached Memorandum of Points and Authorities, Request for Judicial Notice and the Declaration of Vincent H. Chieffo, and the documents attached thereto, which are either referenced in the FAC and are not subject to dispute as to authenticity, or are the proper subject of judicial notice by this Court, and on any other matter the Court may properly consider.

///
///
///
///
///
///

*LA 132458351*

1    This Motion is made following the conference of counsel pursuant to L.R. 7-3

2 which took place on February 1, 2016.

3 DATED:  February 10, 2016          GREENBERG TRAURIG, LLP

4

5                                    By:   /s/ Jeff E. Scott
                                           Jeff E. Scott
6                                    Attorneys for Defendants NBCUniversal Media,
                                     LLC, erroneously sued as "NBCUniversal, Inc.;"
7                                    F. Gary Gray; O'Shea Jackson Sr., p/k/a Ice Cube;
                                     Andre Young, p/k/a Dr. Dre; The Estate of Eric
8                                    Wright, p/k/a Eazy E; Tomica Woods-Wright,
                                     individually and as the personal representative of
9                                    The Estate of Eric Wright; Comptown Records,
                                     Inc.; Matt Alvarez; Scott Bernstein; Legendary
10                                   Pictures Funding, LLC, erroneously sued as
                                     "Legendary Pictures;" Xenon Pictures, Inc., sued
11                                   as "Xenon Pictures, Inc./Xenon Entertainment
                                     Group;" Jonathan Herman; Andrea Berloff; S.
12                                   Leigh Savidge; Alan Wenkus

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA 132458351

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................. 1

II.    STATEMENT OF FACTS ...................................................... 2

       A.    ALLEGATIONS OF THE FAC ...................................... 2

       B.    PLAINTIFF'S BOOK "RUTHLESS:  A MEMOIR" .......... 5

       C.    THE 1997 LITIGATION BETWEEN PLAINTIFF AND
             DEFENDANTS WOODS-WRIGHT AND COMPTOWN RECORDS ...... 8

III.   ARGUMENT ....................................................................... 10

       A.    CALIFORNIA'S "ANTI-SLAPP STATUTE" ................... 10

       B.    THE ANTI-SLAPP STATUTE BARS CLAIMS 1-8. ......... 13

       C.    PLAINTIFF CANNOT SHOW A REASONABLE PROBABILITY
             OF PREVAILING ON ANY OF CLAIMS 1-8 AGAINST ANY
             DEFENDANT. ....................................................... 15

             1.    Law Governing Plaintiff's Defamation and Injurious Falsehood
                   Based Claims 1-3, and 5-8 ........................................... 15

                   a.    Plaintiff is at Least a Limited Purpose Public Figure. ... 16

                   b.    Plaintiff Cannot Demonstrate the Requisite Probability
                         that the Alleged Defamatory Inferences in the Film Arise
                         From False Statements of Fact. ................................ 17

                   c.    Plaintiff Cannot Demonstrate the Requisite Probability of
                         Proving All Defendants Made the Alleged Defamatory
                         Inferences with "Actual Malice" or That All Defendants
                         Affirmatively Intended or Endorsed any Defamatory
                         False Inferences. ................................................. 23

             2.    Plaintiff Cannot Demonstrate the Requisite Probability of
                   Prevailing on His Misappropriation of Likeness Claim 4. ......... 24

IV.    CONCLUSION .................................................................... 25

*LA 132458351*

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655,*
    39 F.3d 191, 196 (8th Cir. 1994) ...................................................................21, 22

*Chapin v. Knight-Ridder, Inc.,*
    993 F.2d 1087 (4th Cir. 1993) ...................................................................22

*Cher v. Forum Int'l Ltd.,*
    692 F.2d 634 (9th Cir. 1982) ...................................................................24

*Daly v. Viacom, Inc.,*
    238 F. Supp. 2d 1118 (N.D. Cal. 2002) ...................................................................24

*Dodds v. Am. Broad. Co.,*
    145 F.3d 1053 (9th Cir. 1998) ...................................................................16

*Galbraith v. Cnty. of Santa Clara,*
    307 F.3d 1119 (9th Cir.2002) ...................................................................13

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ...................................................................23

*Hilton v. Hallmark Cards,*
    599 F.3d 894 (9th Cir. 2009) ...................................................................11,

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952) ...................................................................3

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) ...................................................................13, 17, 18

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir.2001) ...................................................................13

*Leidholdt v. L.F.P. Inc.,*
    860 F.2d 890 (9th Cir. 1988) ...................................................................15

*Makaeff v. Trump Univ., LLC,*
    715 F.3d 254 (9th Cir. 2013) ...................................................................16, 23

*Masson v. New Yorker Magazine, Inc.,*
    501 U.S. 496 (1991) ...................................................................18, 19, 22

ii

*Metabolife Int'l, Inc. v. Wornik*,
   264 F.3d 832 (9th Cir 2001) ...................................................................... 11, 12

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990) ........................................................................................... 22

*Moldea v. New York Times Co.*,
   22 F.3d 310 (D.C. Cir.), *cert. denied*, 513 U.S. 875 (1994) ........................ 22

*Murray v. Bailey*,
   613 F. Supp. 1276 (N.D. Cal. 1985) ............................................................. 23

*Newton v. National Broad. Co., Inc.*,
   930 F.2d 662 (1990) ................................................................................ 16, 24

*Phantom Touring, Inc. v. Affiliated Publ'n*,
   953 F.2d 724 (1st Cir.), *cert. denied*, 504 U.S. 974 (1992) ......................... 22

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1995) ................................................................*passim*

*Rogers v. Home Shopping Network, Inc.*,
   57 F. Supp. 2d 973 (C.D. Cal. 1999) ............................................................. 2

*Sarver v. Hurt Locker LLC*,
   2011 WL 11574477 (C.D. Cal 2012) .................................................. 11, 13, 16

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ...................................................................................... 23

*Stilts v. Globe Int'l, Inc.*,
   91 F.3d 144, 1996 WL 370142 (6th Cir. 1996), *aff'g* 950 F. Supp. 220 (M.D.
   Tenn. 1995) ..................................................................................................... 21

*Thomas v. Los Angeles Times Commc'ns, LLC*,
   189 F. Supp. 2d 1005 (C.D. Cal. 2002) .................................................. 11, 16

*Unelko Corp. v. Rooney*,
   912 F.2d 1049 (9th Cir. 1990), *cert. denied*, 499 U.S. 961 (1991) ......... 15, 17

*William O'Neil & Co. v. Validea.com, Inc.*,
   202 F. Supp. 2d 1113 (2002) ......................................................................... 25

*Wynn v. Chanos*,
   75 F. Supp. 3d 1228 (N.D. Cal. 2014) .......................................................... 18

**State Cases**

*Baker v. Los Angeles Herald Examiner*,
   42 Cal. 3d 254 (1986) .............................................................................. 17, 18

iii

*Blatty v. New York Times Co.*,
   42 Cal. 3d 1033 (1986) ................................................................... 15

*Briggs v. Eden Council for Hope & Opportunity*,
   19 Cal. 4th 1106 (1999) .................................................................. 11

*Couch v. San Juan Unified Sch. Dist.*,
   33 Cal. App. 4th 1491 (1995) .................................................... 16, 18

*Dora v. Frontline Video, Inc.*,
   15 Cal. App. 4th 536 (1993) ....................................................... 24, 25

*Guglielmi v. Spelling-Goldberg Prods.*,
   25 Cal. 3d 860 (1979) ..................................................................... 24

*Hall v. Time Warner, Inc.*,
   153 Cal. App. 4th 1337 (2007) ...................................................... 14

*Hunter v. CBS Broad., Inc.*,
   221 Cal. App. 4th 1510 (2013) ...................................................... 12

*Ingels v. Westwood One Broad. Servs., Inc.*,
   129 Cal. App. 4th 1050 (2005) ...................................................... 14

*Kronemyer v. Internet Movie Data Base, Inc.*,
   150 Cal. App. 4th 941 (2007) ........................................................ 14

*Live Oak Publ'g Co. v. Cohagan*,
   234 Cal. App. 3d 1277 ................................................................... 17

*Montana v. San Jose Mercury News, Inc.*,
   34 Cal. App. 4th 790 (1995) ....................................................... 24, 25

*Navellier v. Sletten*,
   29 Cal. 4th 82 (2002) ................................................................ 11, 12

*Nygard, Inc. v. Uusi-Kerttula*,
   159 Cal. App. 4th 1027 (2008) ....................................... 11,12, 14, 16

*Polydoros v. Twentieth Century Fox Film Corp.*,
   67 Cal. App. 4th 318 (1997) .......................................................... 14

*Reader's Digest Assoc., Inc. v. Superior Court*,
   37 Cal. 3d 244 (1984) ......................................................... 20, 21, 23

*Seelig v. Infinity Broad. Corp.*,
   97 Cal. App. 4th 798 (2002) ................................................. 14, 16, 18

*Shulman v. Group W Prods., Inc.*,
   18 Cal. 4th 200 (1998) ................................................................... 14

iv

*Stewart v. Rolling Stone, LLC,*
 181 Cal. App. 4th 664 (2010) ..........................................................25

*Vijay v. Twentieth Century Fox Film Corp.,*
 2014 WL 5460585 (C.D. Cal. 2014) ...........................................24

**Statutes**

Cal. Civ. Proc. Code § 425.16 ............................................................11

Cal. Civ. Proc. Code § 425.16(a) ...................................................1, 11

Cal. Civ. Proc. Code § 425.16(b)(1) .................................................11

Cal. Civ. Proc. Code § 425.16(e) .......................................................11

Cal. Civ. Proc. Code § 425.16(e)(3) ..................................................13

Cal. Civ. Proc. Code § 425.16(e)(4) ..................................................13

**Rules**

Fed. R. Civ. Proc. 8 ...........................................................................12

Fed. R. Civ. Proc. 12(b) (6) ..............................................................12

Fed. R. Evid. 201(d) ..........................................................................13

**Other Authorities**

Gerald Heller & Gil Reavill, *Ruthless: A Memoir* (2006) ..........................................*passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*LA 132458351*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

California's anti-SLAPP statute allows courts to put an early end to litigation claims that "chill the valid exercise of the constitutional rights of freedom of speech." Cal. Code of Civ. Proc. § 425.16(a).  There can be no doubt that Claims 1 through 8 of the First Amended Complaint ("FAC") qualify for protection and early dismissal under the statute.

Claims 1 through 8 are based on the assertion that twelve Defendants "had a hand in creating, writing, directing, producing, editing, and/or distributing globally" the theatrical motion picture "Straight Outta Compton" ("the Film").  FAC ¶ 1. The premise of these claims is Plaintiff's theory that he has been defamed, or his image has been misappropriated, by the depiction of the "Jerry Heller" character in the Film.  Because these claims fall directly within the scope of protection afforded by the anti-SLAPP statute, the burden is shifted to Plaintiff Gerald E. Heller ("Plaintiff" or "Heller") to demonstrate a "probability" of prevailing on his claims.  Plaintiff cannot meet this burden.

The Film is a docudrama chronicling a decade-long story from 1986 to 1996 of the pioneering rap record company, Ruthless Records, the rise and demise of Ruthless Records' extremely successful musical group, N.W.A., and the careers and personal relationships of members of N.W.A.  The Film is set against the backdrop of epochal change in the rap music industry, and the social and racial tensions of the time, including the tension between the police and African American residents of Compton and the efforts of law enforcement and others to censor N.W.A.  Plaintiff was part of this history both as the manager of Ruthless Records and as the manager of all but one of the members of N.W.A.  The Film depicts Plaintiff, the members of N.W.A., including Defendants Andre Young (p/k/a Dr. Dre) ("Dr. Dre"),  O'Shea Jackson (p/k/a Ice Cube) ("Ice Cube"), Eric Wright (p/k/a Eazy E) ("Eazy E"), who died in 1995, and also Defendant Tomica Woods-Wright ("Woods-Wright"), Eric Wright's widow.

1

In recounting the highly publicized rise and fall of Ruthless Records and N.W.A., the Film includes criticism of Plaintiff that had been very publicly leveled against him by members of N.W.A. and others.  Plaintiff's own previously published book recounting his version of these events concedes that he had been subjected to such public criticism.  Plaintiff's management of Ruthless Records and N.W.A. led to two lawsuits filed in 1997 in the Los Angeles Superior Court.  Plaintiff appears to claim that the Film allows false implications to be drawn from that criticism.  As explained below, any such alleged implications are at most expressions of opinion based on ambiguous and hotly-debated historical events and are not actionable as injurious falsehoods under governing law.  Moreover, Plaintiff, as a public figure in these public events, will not be able to demonstrate a probability of prevailing on his constitutionally-mandated burden of proving with clear and convincing evidence that each Defendant acted with "actual malice," *i.e.*, with knowledge of falsity or with reckless disregard of the truth, or that each Defendant affirmatively intended or endorsed those allegedly false and defamatory implications.  Nor will Plaintiff be able to demonstrate a probability of success on his claim for misappropriation of his likeness in a docudrama about the historic events of great public interest dramatized in the Film.

Because Plaintiff will not be able to meet his burden of demonstrating a probability of prevailing on any of his Claims 1-8 as to any Defendant, this motion to strike should be granted as to all Defendants.

## II.   <u>STATEMENT OF FACTS</u>

The following facts are based on Plaintiff's allegations in the FAC, Plaintiff's statements in his 2006 book "Ruthless:  A Memoir," his allegations in a verified complaint he filed in 1997, and the allegations in a complaint against Plaintiff also filed in 1997.  Defendants' Request For Judicial Notice and Chieffo Declaration ("RJN") Exhs. 2 – 4.

## A.   <u>ALLEGATIONS OF THE FAC</u>

Plaintiff met Eazy E, Dr. Dre, and Ice Cube between 1986 and 1987.  FAC ¶ 23.

In early 1987, Eazy E formed a record company called Ruthless Records that Plaintiff managed in exchange for a "20% interest in Ruthless." *Id*.   Eazy E, Ice Cube, Dr. Dre, and others formed a musical group known as N.W.A., which entered into "an exclusive Recording contract with Ruthless" and "Ruthless arranged for [Plaintiff] to provide management services to all of the members of N.W.A., except Ice Cube, for a standard 20% commission." *Id*. at ¶ 24.  Under Plaintiff's management, Ruthless "entered into a series of exclusive music publishing agreements with" Eazy E, Ice Cube, and Dr. Dre, entitling "Ruthless to a percentage of gross music publishing revenues generated by music composition written in whole or in part by" all or any of them.  *Id*. at ¶ 25.

The FAC admits that the Film accurately depicts at least some of the historical events in question (*id*. at ¶¶ 27-29, 38, 39, 110, 122), but alleges that Plaintiff has been defamed by "certain scenes, words, statements, images, implications and innuendo" in the Film.  *Id*. at ¶ 1.  The FAC does not identify any specific statements in the Film that Plaintiff claims to be defamatory.  Instead, Plaintiff alleges only his general, subjective interpretations of the Film, as follows:

> Heller is the "bad-guy" in the movie who is solely responsible for the demise of N.W.A.; Heller is a sleazy manager who took advantage of Defendants Eazy E, Dr. Dre and Ice Cube, effectively, by stealing their money; Heller steered Dr. Dre and Ice Cube away from hiring an attorney to review any contracts so they could never get paid; Heller intentionally withheld a $75,000 check from Ice Cube that rightfully belonged to Ice Cube; Heller induced Dr. Dre to sign an unfavorable contract; Heller made sure he was paid more than his fair share to the detriment of the other members of N.W.A.; Heller did not pay numerous bills and expenses of N.W.A., rather, he paid himself first; Heller abandoned Dr. Dre and the D.O.C. after his car accident, but Suge Knight stepped in to take care of them[;] Heller intentionally kept the members of N.W.A. in the dark regarding finances; Heller was enjoying "lobster brunches" while the contracts of Defendants Dr. Dre and Ice Cube

3

were "still being finalized" and relegated to eating "Fatburger"; Dr. Dre accuses Heller of stealing money and says that Ice Cube was right about him; Ice Cube states in an interview at his home that the Jewish Defense League should not condone Heller's behavior in trying to get him to sign a contract without his attorney's review; Tomica Woods-Wright tells Eazy-E that Heller took advantage of [Eazy E] and left him with 2-3 years of unpaid bills; Eazy E fires Heller in Heller's kitchen after accusing him of illegal activity, and Heller says in his defense that Eazy-E screwed things up and that Heller took actions to cover his own (rear end).

*Id.* at ¶ 36. Elsewhere, the FAC alleges that unidentified portions of the Film depict Plaintiff "as a sleazy, greedy, selfish, personal manager that took advantage of the members of N.W.A. and caused the demise of N.W.A.," and as being "corrupt, deceitful, crooked, and fraudulent." *Id.* at ¶¶ 48, 49, 71.

The FAC baselessly lumps 12 named Defendants—who played widely divergent roles in connection with the Film—together with the generic, unsupportable false allegations that all of them "had a hand in creating, writing, directing, producing, editing, and/or distributing globally" the Film and that as "credited producers" they each are "responsible for the publication" of the allegedly defamatory portions of the Film. *Id.* at ¶¶ 1, 5-10, 12, 14-19, 42. The FAC further alleges the unsupportable false conclusion that all twelve Defendants "published" all of the alleged defamatory statements in the Film, "either with knowledge that they were false and defamatory of Plaintiff, or with reckless disregard for their truth or falsity and the defamatory nature of the statements." *Id.* at ¶ 52; *see also* ¶¶ 50, 64, 69.

Based on the alleged defamatory content of the Film and the alleged reputational damage, Plaintiff asserts five tort claims: Defamation (Claim 1), Trade Libel, (Claim 2), False Light (Claim 3), Intentional Interference with Prospective Economic Advantage (Claim 5), and Negligent Interference with Prospective Economic Advantage (Claim 6). Additionally, Claims 7 and 8 are breach of contract claims against only Defendants

4

Woods-Wright and Comptown Records predicated on the same putative injurious falsehoods and alleged resulting breaches of a "non-disparagement" clause included in a 1999 settlement agreement between Plaintiff, on the one hand, and Defendants Woods-Wright and Comptown Records, on the other. *Id*. at ¶¶ 93, 94, 96, Exh. B at 1, 15. Based on the inclusion of the "Jerry Heller" character in the Film, Plaintiff also asserts a claim for misappropriation of likeness in Claim 4.[1]

**B.    PLAINTIFF'S BOOK "RUTHLESS:  A MEMOIR"**

In 2005, Plaintiff wrote a book "relating the story of Ruthless and N.W.A.," which was published by Simon and Schuster in 2006 and entitled "Ruthless:  A Memoir" ("Plaintiffs' Memoir").  FAC at ¶¶ 29, 30.  Set forth below are relevant statements in Plaintiff's Memoir.  RJN,  Exh. 2.

> This is a work of non-fiction.  I have done my best to tell this story the way it happened and, in many cases, clear up standing misconceptions and misunderstandings.  Events and actions have been retold as I have remembered them.  Conversations presented in dialogue form have been recreated based on my memory of them, they are not intended to represent word for word documentation of what was said; they are meant to evoke the substance of what was actually said.

Plaintiff's Memoir at Preface.

"The start of the Ruthless era" began on March 3, 1987 when Plaintiff was introduced to Eazy E, who told Plaintiff he wanted to start his own record label, "Ruthless Records," and the music group "NWA."  *Id*. at 60, 64.  Plaintiff and Eazy E agreed that Eazy E would be the sole owner of Ruthless Records and Plaintiff would be paid 20% of "every dollar [that] comes into Ruthless," with Plaintiff responsible for his expenses and Eazy E responsible for his expenses.  Plaintiff acknowledged that, "[l]ater

---

[1] Claims 1 – 6 of the FAC are alleged against all named Defendants other than Comptown Records, Xenon Pictures, Inc./Xenon Entertainment Group, and the purported Defendant "The Estate of Eric Wright."

1   on people used this deal to discredit me," but said "it definitely fit within the industry

2   standards for a startup act." *Id*. at 74-75.  Plaintiff "acted as the general manager of

3   Ruthless Records." *Id*. at 22.

4        Plaintiff describes himself as the "financializer" of Ruthless Records and N.W.A.,

5   saying, in his view, that "artists should make music; it doesn't pay for them to have to

6   spend time financializing."  "But musicians need someone behind them they can trust to

7   take care of the business details."  *Id*. at 103, 166-67.

8        One of Plaintiff's duties was to "protect the life of the goose that laid the golden

9   egg, NWA a rap supergroup, the black Beatles." *Id.* at 22.  Plaintiff  "acted as the general

10  manager of Ruthless Records so that had to be my ultimate goal, a mandate so obvious

11  that it didn't even need to be spelled out."  *Id.*  Plaintiff "failed because [he] couldn't

12  imagine any one coming in between the two most crucial members of the group, Eazy-E

13  and Dr. Dre."  *Id*.

14  N.W.A.'s first studio album, "Straight Outta Compton," was released in 1988 and was a

15  hit, selling 3 million units.  *Id*. at 132.  Plaintiff booked N.W.A. on a national tour

16  starting on Memorial Day 1989 in Nashville.  Plaintiff describes this tour as "a 'Platinum

17  card' tour with everything, including hotels, meals and airline tickets for 29 people, put

18  on Jerry 'Sugar Daddy' Heller's American Express Platinum card." *Id.* at 135.

19  [Plaintiff's] credit report was starting to glow in the dark."  *Id*. at 136.  During this tour,

20  in Phoenix, Ruthless was prepared to pay $75,000 checks to each band member,

21  contingent on them officially signing with the label. "Everyone signed except Cube." *Id*.

22  at 138.  "He refused the check on the advice of his San Francisco lawyer, Michael

23  Ashburn."  *Id.*  "It was just one more sign of the ongoing trouble with [Cube]."  *Id.*

24        During the 1989 tour, Ice Cube complained and "said he wasn't being paid what he

25  was worth."  *Id*. at 158.  Plaintiff describes Ice Cube as "the eternal troublemaker."  *Id*. at

26  183.  Plaintiff quotes Ice Cube as saying, "[t]here was no way I was ever going to get

27  paid what I was worth at Ruthless."  *Id*. at 294.  Ice Cube "was always a major pain in the

28  ass – a complainer, a borderline paranoiac …. [but] Cube didn't have all the facts.  He

only thought he did." *Id*. at 136.  "There were a lot of people involved in turning Cube against Ruthless."  *Id*. at 182.  "Chief among them were Bryan Turner and his director of publicity at Priority Records, Pat Charbonnet."  *Id*.  Ice Cube was publicly critical of Plaintiff's business relationship with Eazy E.  *Id*. at 180-81.

Ice Cube left N.W.A. by 1990, and in the last part of 1990, Heller realized that Dr. Dre would also be leaving Ruthless.  *Id*. at 186.  Dr. Dre "became distant and evasive" and began spending more and more time with the D.O.C.[2]  *Id*. at 187.  "The D.O.C. was one of those who were whispering in Dre's ear that Eazy and Ruthless were ripping him off."  *Id*. at 187-88.  Dr. Dre began to miss studio dates and to "complain constantly about not getting paid, not having money, not getting what was due to him."  *Id*. at 192. Dr. Dre left in 1991 after Suge Knight "obtained releases from Eazy-E that effectively meant the end of NWA."  *Id*. at 24-25.

Plaintiff  recounts that he "left Ruthless five weeks before Eric Wright passed away at Cedars Sinai Hospital on March 26, 1995" and that he was not allowed to visit Eazy E while he was in the hospital prior to his death.  *Id*. at 297, 299.

"Cube and Dre would eventually claim that my partnership with Eazy-E at Ruthless was poisoned[—t]hat it was not a relationship of equals but one of plantation master and field slave, oppressor and oppressed, exploiter and victim."  *Id*. at 6.  "There are plenty of people who knee-jerk agree with them."  *Id*.  "For a long time, … I kept quiet."  *Id*. at 9.  "I didn't care what Dre or Cube or the D.O.C. said about me—even when they lied publicly that I had stolen money from them, ripped off, cheated them." *Id*. "All these years I have never answered the allegations of financial impropriety leveled against me, first by Cube and then by Dre."  *Id*. at 292.   "I've had to sit still and listen for two decades now to accusations from a pair of former friends and their advisors that I was a thief, a liar, and a cheat, that I was caught with my 'hand in the cookie jar,' that I had signed them to 'draconian' contracts."  *Id*.  "But I know the truth, and the truth is in

---

[2] The professional name "D.O.C." refers to Tracy Curry, the "'Fifth Beatle' in N.W.A." *Id*. at 120.  The D.O.C. is also depicted in the Film.

LA 132458351

1    this book." *Id.* at 10. "It's my truth, but it's also Eazy's truth." *Id.* at 11.

2    **C.    THE 1997 LITIGATION BETWEEN PLAINTIFF AND DEFENDANTS**

3    **WOODS-WRIGHT AND COMPTOWN RECORDS**

4    In 1997, Plaintiff sued Defendant Woods-Wright (individually and as co-Executor

5    of the Estate of Eric Wright), Defendant Comptown Records, Inc. (d/b/a/ Ruthless

6    Records), and others in the Los Angeles Superior Court, Case No. BC172414.  That

7    litigation was consolidated with an action brought against Plaintiff by those two

8    Defendants and a co-trustee of the Eric Wright Trust, and both cases were settled in

9    1999, as memorialized by a written settlement agreement.  FAC ¶ 93, Exh. B.[3]  Plaintiff's

10   verified complaint in that case ("1997 Complaint") asserted various claims, including

11   claims premised on the alleged wrongful termination "in or about March 1995" of

12   Plaintiff's management agreements with Eazy E and Ruthless Records.  RJN, Exh. 3.[4]

13   The Complaint against Plaintiff alleged fraud, breach of fiduciary duty and related claims

14   over Plaintiff's management of Ruthless Records and N.W.A. (the "Woods-Wright

15   Complaint").   RJN, Exh. 4.

16   In 1987, Plaintiff and Eazy E entered into an oral agreement for Plaintiff "to act as

17   [Eazy E's] personal Manager with respect to all of Wright's activities in the music and

18   entertainment industries" (1997 Complaint at ¶ 10), and "in lieu of providing Heller an

19   ownership interest in Ruthless, in consideration of Heller terminating his independent

20   representation of certain other musical groups Heller then had under contract,[5] and in

21   consideration of the management services to be performed by Heller," Plaintiff and Eazy

22   E entered into an oral agreement by which Plaintiff would:  1) receive a 20% commission

23

24   [3]  The 1997 litigation is not disclosed in Plaintiff's Memoir published in 2006.

25   [4]  Plaintiff's version of events in his 1997 Complaint are not always consistent with his
     version told in his Memoir or in the FAC in this action.

26
     [5]  This allegation contradicts the FAC's allegations that Plaintiff also managed members
27   of N.W.A. (FAC at ¶ 24) and the admissions in Plaintiff's Memoir that he continued to
     manage those musical groups and artists that agreed to be signed to Ruthless Records
28   (Plaintiff's Memoir at p. 78).

LA 132458351

"based upon gross revenues earned by Ruthless/Wright from any and all activities in the music and entertainment industries;" 2) receive 50% "of the gross proceeds of the sale of publishing rights from music owned or/otherwise controlled by Wright/Ruthless;" 3) receive 20% "of the gross proceeds in the event of a sale of Ruthless;" and 4) be reimbursed "for the expenses incurred by him, in any manner relating to his services on behalf of Wright/Ruthless."[6] *Id*. at ¶ 12(a).

As manager of Ruthless and Eazy E, "Heller was responsible for negotiating a variety of very profitable contracts for Wright and Ruthless including … the original contract with Dr. Dre." *Id*. at ¶ 23.  Moreover, and "[c]ontrary to normal industry practice," Plaintiff negotiated the retention of both a substantial portion of the publishing rights on every Ruthless Records song and, in most cases, the right to administer those songs. *Id*. at ¶ 24.  He also acknowledged that record companies "do not customarily retain either of these valuable rights," which "have proven to be worth millions of dollars to Wright/Ruthless."[7] *Id*.

"Heller and Wright were each the sole signatory required on each of Wright's various personal and business bank accounts as well as on the corporate bank account opened after the incorporation of Ruthless." *Id*. at ¶ 19.  Under Plaintiff's management, Eazy E's personal affairs and Ruthless Records' business affairs were commingled. *Id*. at ¶ 87.

In 1994, Eazy E wrote to Plaintiff expressing concerns about Plaintiff's management of Ruthless Records and the lack of financial information Plaintiff was

---

[6]  This allegation contradicts Plaintiff's claim in his Memoir (at pp. 74-75) that he had no ownership interest in Ruthless Records.  According to the 1997 Complaint, Plaintiff had an effective ownership interest equal to 50% of Ruthless Records' music publishing assets and 20% of, presumably, Ruthless Records' non-music publishing assets—both due upon sale of those assets.  1997 Complaint at ¶ 12.

[7]  These music publishing agreements were "contrary to normal industry practice" and worth "millions of dollars to Wright/Ruthless" and thus increased the amount of Plaintiff's 20% management fee of the gross revenues of Ruthless, including "exclusive music publishing contracts" with Eazy E, Dr. Dre, and Ice Cube.  FAC ¶ 25.

providing, stating, in part: "I want a list of who I'm paying & how much I'm paying them weekly & monthly," "I want to know when money comes in, how much and how much goes out," "I think I should sign all checks, sometimes it does not look good if I don't, maybe we should have double signature checks," and "I think I should have a separate account for child support bill that don't have anything to do with Ruthless Records." *Id.* at ¶ 32, Exh. A, pp. 1-2.

Plaintiff alleged that he had an oral employment agreement with Ruthless Records and a management agreement with Eazy E, and that both were wrongfully terminated "in or about March 1995." FAC ¶¶ 65 and 74.

Woods-Wright and Comptown Records' 1997 suit against Plaintiff further evidences the public dispute over Plaintiff's management and relationship with N.W.A., as depicted in part in the Film. For example, the Woods-Wright Complaint alleges that Eazy E became aware of Plaintiff's "abysmal management" "in or around November 1994," that Eazy E hired an entertainment attorney in January 1995 to provide all of Comptown Records' "entertainment-related legal services," that Eazy E hired Woods-Wright "to manage the business affairs of Comptown," and that Plaintiff was terminated in writing on or about January 20, 1995 (while Eazy E was alive). Woods-Wright Complaint ¶ 12. The Woods-Wright Complaint also alleges that Plaintiff's misconduct included his taking 20% off the top of Comptown Records' gross income instead of 15% of Eazy E's personal adjusted gross income, that Plaintiff concealed a large expense account at Comptown Records that he used, that he took a 20% commission on advances paid to Comptown Records, leaving it unable to pay its expenses, and that he never explained the conflict of interest in acting as a general manager of Comptown Records while also acting as personal manager for other musical artists under contract with the label. *Id.* at ¶ 18.

### III.   ARGUMENT

### A.   CALIFORNIA'S "ANTI-SLAPP STATUTE"

As the Ninth Circuit has recognized, California's anti-SLAPP statute, California

Code of Civil Procedure § 425.16,[8] "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression though costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornik*, 264 F.3d 832, 839 (9th Cir 2001).  Courts "whenever possible, should interpret the First Amendment and section 425.16 in a manner 'favorable to the exercise of freedom of speech, not its curtailment.'" *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1119 (1999) (citation omitted); Cal. Civ. Proc. Code §425.16(a) (Legislature directs that the anti-SLAPP statute "shall be construed broadly").  Defendants can challenge California state law claims pending in federal court under Section 425.16 and California case law interpreting its application. *See, e.g.*, *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2009); *Sarver v. Hurt Locker LLC*, No. 2:10-CV-09034-JHN, 2011 WL 11574477 *3 (October 13, 2012 C.D. Cal), (Appeal Pending, Ninth Circuit Docket # 12-55429); *Thomas v. Los Angeles Times Commc'ns, LLC*, 189 F. Supp.2d 1005, 1010 (C.D. Cal. 2002).

Under Section 425.16, any  "cause of action against a person arising from any act in furtherance of the person's right of … free speech … in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  Cal. Civ. Proc. Code § 425.16(b)(1).

In *Navellier v. Sletten*, 29 Cal. 4th 82 (2002), the California Supreme Court outlined the two-step process used in applying Section 425.16.  "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." *Id.* at 88.  This prong is satisfied if the conduct fits into one of the four categories enumerated in Section 425.16(e).[9] *Nygard, Inc. v.*

---

[8] Hereinafter, "Section 425.16."

[9] As applicable in this case, an act in furtherance of a person's right of free speech includes: "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Section 425.16(e).

11

1  *Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1036 (2008).  Second, if the claim arises from

2  protected conduct, the court "must then determine whether the plaintiff has demonstrated

3  a probability of prevailing on the claim."  *Id*.  If the plaintiff cannot meet this burden, the

4  claim must be stricken.  *Id*.

5       Analysis of the first prong is focused "not on the form of plaintiff's cause of

6  action, but, rather, the defendant's *activity* that gives rise to his or her asserted liability –

7  and whether that activity constitutes protected speech or petitioning."  *Navellier*, 29 Cal.

8  4th at 92 (emphasis in original) (applying anti-SLAPP motion to breach of contract

9  claim).  "In the anti-SLAPP context, the critical consideration is whether the cause of

10  action is *based on* the defendant's protected free speech or petitioning activity."  *Id*. at 89

11  (emphasis in the original, citations omitted); *Hunter v. CBS Broad., Inc*. 221 Cal. App.

12  4th 1510, 1520 (2013) ("In assessing whether a cause of action arises from protected

13  activity, we disregard the labeling of the claim and instead examine the *principle thrust*

14  or gravamen of a plaintiff's cause of action …  We assess the principle thrust by

15  identifying the allegedly wrongful and injury-producing conduct … that provides the

16  foundation of the claim.") (emphasis in original, citation and internal quotation marks

17  omitted).

18       If the first prong is met, the plaintiff must demonstrate that the claim "is both

19  legally sufficient and supported by a sufficient prima facie showing of facts to sustain a

20  favorable judgment if the evidence submitted by the plaintiff is credited."  *Navellier*, 29

21  Cal. 4th at 88-89 (citation and internal quotation marks omitted).  In addition, where an

22  anti-SLAPP motion in federal court "identifies legal defects on the face of the pleading,"

23  the motion is "analogous to a Rule 12(b)(6) motion to dismiss" and the court "must

24  decide the motion in a manner that complies with standards set by Federal Rules 8 and

25  12."  *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 982-83 (C.D. Cal.

26  1999); *see also Metabolife Int'l, Inc.*, 264 F.3d at 832, 846-47.[10]

27  _____

28  [10] As shown in Defendants' concurrently-filed Motion to Dismiss, Plaintiff's FAC does
    not sufficiently plead Claims 1-8 or other Claims.  Among other deficiencies, the FAC

This Motion is based on the allegations of the FAC, the contents of Plaintiff's Memoir and the Film (both of which are referenced in the FAC), Plaintiff's verified 1997 Complaint (also expressly referenced in the FAC), and the 1997 Complaint filed by Woods-Wright, another co-trustee of the Eric Wright Trust, and Comptown Records, all of which this Court may judicially notice.  RJN, Exhs. 1-4; *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (upholding judicial notice of documents referenced in, but not attached to, complaint); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–90 (9th Cir.2001) (matters of public record), overruled on other grounds by *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir.2002); *see also* Fed. R. Evid. 201(d).

**B.    THE ANTI-SLAPP STATUTE BARS CLAIMS 1-8.**

Claims 1-8 arise from twelve of the fifteen named Defendants allegedly jointly creating, writing, directing, producing, distributing and publishing the Film, and the content of the Film.  FAC ¶¶ 1, 42.  Plaintiff alleges that the Film defames Plaintiff (Claim 1), constitutes trade libel (Claim 2), places him in a false light (Claim 3), misappropriates his likeness (Claim  4), intentionally or negligently interferes with his prospective economic advantage (Claims 5 and 6) and breaches a non-disparagement clause in a contract with Defendants Woods-Wright and Comptown Records (Claims 7 and 8).  Each one of these Claims falls squarely within the scope of protection afforded by Section 425.16, and within the definitions of Section 425.16(e)(3) and (4).[11]

Motion pictures are a "significant medium for the communication of ideas" and an "organ[] of public opinion" protected by the First Amendment.  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 500-02 (1952); *see also Sarver*, 2011 WL 11574477 at *4;

---

fails to identify how any of the Defendants was responsible for the challenged scenes in the Film, leaving Defendants guessing what they allegedly did wrong, in violation of Fed. R. Civ. P. 8's basic notice pleading requirement.  *See* Motion to Dismiss at § III.B. These arguments are not repeated here but are incorporated by reference as they further establish why Plaintiff cannot satisfy his burden to show the required likelihood of success.

[11]   It cannot be disputed that the challenged content of the Film was exhibited in a manner open to the public or in a public forum.  Section 425.16(e)(3); FAC ¶¶ 3, 40.

*Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 225 (1998) ("the constitutional guarantees of freedom of expression apply with equal force to ... an entertainment feature"); *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 323-24 (1997) ("Film is . . . protected by constitutional guarantees of free expression").

The Film is indisputably concerned with a public issue and matters of public interest.  Within the anti-SLAPP statute, "[a]ny issue in which the public takes an interest is of 'public interest.'"  *Nygard, Inc.*, 159 Cal. App. 4th at 1039.  The Film is a docudrama recounting the history of the groundbreaking Ruthless Records, the meteoric rise of its hugely successful musical group, N.W.A., Eazy E's death from AIDS in 1995, the very public departure of Ice Cube and Dr. Dre from N.W.A., and the integral involvement of Plaintiff in that entire history.  Indeed, because of the controversies generated during the events depicted in the Film, and the intense public interest in and impact of N.W.A., Plaintiff wrote his Memoir to tell what he calls his "truth."  Plaintiff's Memoir at pp. 10-11.

Based on clear precedent, Defendants easily establish that the Film raises public issues and matters of public interest and is protected by the anti-SLAPP statute.  *See, e.g.*, *Kronemyer v. Internet Movie Data Base, Inc.*, 150 Cal. App. 4th 941, 949 (2007) (website's listing of producer credits on a motion picture); *Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App. 4th 1050, 1059, 1075 (2005) (radio talk show about dating); *Hall v. Time Warner, Inc.,* 153 Cal. App. 4th 1337, 1341 (2007) (story on the television program "Celebrity Justice" about a famous actor's housekeeper); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 807 (2002) (live radio show statements about plaintiff's appearance on reality television program "Who Wants to Marry a Multimillionaire"); *Hilton*, 599 F.3d at 908 (greeting card featuring Paris Hilton).

Because Defendants easily satisfy the first prong of the anti-SLAPP statute for Claims 1-8, the burden shifts to Plaintiff to demonstrate—*on a Defendant-by-Defendant basis*—that he has a reasonable probability of success on those claims.  As explained below, Plaintiff cannot satisfy this burden.

**C.  PLAINTIFF CANNOT SHOW A REASONABLE PROBABILITY OF PREVAILING ON ANY OF CLAIMS 1-8 AGAINST ANY DEFENDANT.**

All claims based on alleged defamation or injurious falsehood—however labeled and under whatever legal theory asserted—must comply with the right of free speech guaranteed by the First Amendment.  *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990), *cert. denied*, 499 U.S. 961 (1991) (trade libel and tortious interference with business relationships claims "are subject to the same first amendment requirements that govern actions for defamation"); *Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 893, n.4 (9th Cir. 1988) (public figure plaintiff cannot recover for false light invasion of privacy "unless she also shows that the false statements were made with 'actual malice'" because "the tort of false light privacy is … sufficiently duplicative of libel to be subject to the same limitations") (citation omitted); *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042 (1986) ("Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement.").

1.  Law Governing Plaintiff's Defamation and Injurious Falsehood Based Claims 1-3, and 5-8

In the FAC, Plaintiff alleges his subjective view of what he asserts are the defamatory "implications" of the Film.  Because Plaintiff in his own Memoir admits that the challenged criticisms of him depicted in the Film were in fact leveled against him by N.W.A. members and others (as further evidenced by the 1997 litigation), Plaintiff can only claim false implications from the Film's depiction of those undisputed prior public criticisms.  Accordingly, Defendants analyze Plaintiff's defamation and injurious falsehood Claims under the theory of defamation by implication.

When addressing a defamation by implication claim, the Court 'must determine whether the statements that form the basis of a defamation claim:

(1)  … impliedly assert a fact that is susceptible to being proven false; and

15

(2)  whether the language and tenor is such that it cannot reasonably be interpreted as stating actual facts.

*Thomas,* 189 F. Supp. 2d at 1013 (citations omitted).

Therefore, to show a reasonable probability of success on his defamation and injurious falsehood claims based on alleged inferences from the Film, Plaintiff must first identify facts that, if believed, would show that any allegedly false implications in the Film are of demonstrably provable false statements of facts—as opposed to non-actionable statements of opinion—that are reasonably susceptible to a defamatory meaning.  *Sarver*, 2011 WL 11574477 at *8-*9; *Nygard, Inc.*, 159 Cal. App. 4th at 1048-1049; *Seelig*, 97 Cal. App. 4th at 809; *Couch v. San Juan Unified Sch. Dist.*, 33 Cal. App. 4th 1491, 1500 (1995).

Second, as a limited purpose public figure, Plaintiff must also identify facts (and ultimately provide clear and convincing evidence of those facts) supporting his conclusion that any defamatory inferences of fact about Plaintiff were made by each Defendant with the constitutionally-required fault standard of actual malice, *i.e.*, that they were made with knowledge of their falsity or with a reckless disregard of their truth (*Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 266 (9th Cir. 2013)), and that each Defendant affirmatively "intended to convey the defamatory impression" from the Film (*Newton v. National Broad. Co., Inc.*, 930 F.2d 662, 681 (1990); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998)).

Plaintiff will not be able to make either showing.

### a.  Plaintiff is at Least a Limited Purpose Public Figure.

A plaintiff becomes a "limited purpose public figure" where (i) "public controversy existed when the statements were made;" (ii) "the alleged defamation is related to the plaintiff's participation in the controversy;" and (iii) "the plaintiff voluntarily injected himself into the controversy for the purpose of influencing the controversy's ultimate resolution." *Makaeff*, 715 F.3d at 266.

Plaintiff's own allegations satisfy this standard.  FAC ¶¶ 22-30 (public controversy

has existed since at least 2001 when Plaintiff allegedly collaborated on screenplay about his role in the "hugely successful" N.W.A., followed by publication of his Memoir about the same controversy in 2006, through which Plaintiff injected himself into the controversy[12]); ¶¶ 31-37 (the public controversy was a subject of the Film).  So does the 1997 litigation, in which Plaintiff also was injected into the public controversy.  RJN at Exhs. 3-4.

          b.    <u>Plaintiff Cannot Demonstrate the Requisite Probability that the Alleged Defamatory Inferences in the Film Arise From False Statements of Fact.</u>

The Ninth Circuit applies a three-part test to determine whether defamatory inferences from protected speech such as the Film can reasonably be interpreted to state provably false defamatory facts rather than opinions:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work.  Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation.  Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Knievel*, 393 F.3d at 1075 ; *Unelko Corp.*, 912 F.2d at 1053, *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995).[13]  Indeed, the "context in which the statement appears is

---

[12]  "Generally, authors are considered to have participated sufficiently in public controversies or otherwise involved themselves in matters of public concern as to be public figures."  *Live Oak Publ'g Co. v. Cohagan*, 234 Cal. App. 3d 1277, 1289 1991) (citation and internal quotation marks omitted).

[13]  California courts apply a substantially identical "totality of the circumstances" test to determine whether defamatory inferences can reasonably be interpreted to state provably false defamatory facts.  *Baker v. Los Angeles Herald Examiner*, 42 Cal. 3d 254, 260 (1986).  California's "totality of the circumstances" test considers "the context in which the statement was made" and looks "at the nature and full content of the communication

paramount in our analysis, and in some cases it can be dispositive." *Knievel*, 393 F.3d at 1075.  The application of this test is ordinarily a question of law for the court.  *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1234 (N.D. Cal. 2014); *Baker*, 42 Cal. 3d at 260; *Seelig*, 97 Cal. App. 4th at 810; *Couch*, 33 Cal. App. 4th at 1500.

Here, because the Film is a docudrama, the three-part test must be considered in that context.  The United States Supreme Court has recognized that it would be unreasonable to assume that all statements in a docudrama represent assertions of verifiable facts.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 512-13 (1991).[14]

In *Partington*, the Ninth Circuit applied its three-part test to alleged defamatory inferences from a book and a docudrama based on that book. *Partington*, 56 F.3d at 1154-55.  Partington, a criminal defense attorney, sued Bugliosi, another criminal defense attorney and author, for defamation based on statements about Partington in Bugliosi's book and in a made-for-television motion picture based on that book.  The statements allegedly defamed Partington's performance as a defense attorney in a high profile murder trial.  *Id*. at 1149-50.  Partington claimed he was defamed by implications arising from statements in the book and the made-for-television docudrama.  In affirming the lower court's summary judgment, the Ninth Circuit analyzed the alleged defamatory implications from the made-for-television movie:

> Docudramas, as their names suggests, often rely heavily upon dramatic
> interpretations of events and dialogue filled with rhetorical flourishes in
> order to capture and maintain the interest of their audience.  We believe that
> viewers in this case would be sufficiently familiar with this genre to avoid
> assuming that all statements within them represent assertions of verifiable

and the knowledge and understanding of the audience to whom the publication was directed."  *Id*. at 261.

[14]  "[T]hat the work is so-called docudrama or historical fiction, or that it recreates conversations from memory, not from recordings, might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed."  *Id*. at 513.

18

facts.  To the contrary, most of them are aware by now that parts of such

programs are more fiction than fact.

*Partington*, 56 F.3d. at 1155.  Significantly, the Ninth Circuit in *Partington* also observed, in reasoning especially applicable here:

> When, as here, an author writing about a controversial occurrence fairly
> describes the general events involved and offers his personal perspective
> about some of its ambiguities and disputed facts, his statements should
> generally be protected by the First Amendment.  Otherwise, there would be
> no room for expressions of opinion by commentators, experts in a field,
> figures closely involved in a public controversy, or others whose
> perspectives might be of interest to the public.  Instead, authors of every sort
> would be forced to provide only dry, colorless descriptions of facts, bereft of
> analysis or insight.  There would be little difference between the editorial
> page and the front page, between commentary and reporting, and the robust
> debate among people with different viewpoints that is a vital part of our
> democracy would surely be hampered.

*Id*. at 1154; *see also Masson*, 501 U.S. at 519 (the First Amendment guarantees authors "the interpretive license that is necessary when relying upon ambiguous sources").

As with the made-for-television movie in *Partington*, the Film here is unquestionably a docudrama based on controversial historical events that are subject to various interpretations.  The history of Ruthless Records, N.W.A. and its members is replete with controversial criticisms and rebuttals, and their resulting ambiguities and factual disputes as Plaintiff's own Memoir concedes.  Plaintiff's Memoir at pp. 6, 8-9, 181, 192, 292.[15]  The Film is an interpretation and dramatization of that ambiguous history spanning a 10-year time period over 30 years ago, which was and remains a subject of intense public interest.  Dramatization through fictionalized scenes and

_____

[15]  Even Plaintiff's own recounting of these events lack consistency.  See *supra*, pp. 8-9, n. 4-6.

19

dialogue and compressed or out-of-time sequences are expected in such docudramas, and the Film carries an express disclaimer to this effect.[16]  As stated by the Ninth Circuit, the First Amendment provides "breathing space in order to criticize and interpret the actions and decisions of those involved in a public controversy.  If they are not granted leeway in interpreting ambiguous events and actions, the public dialogue that is so important to the survival of our democracy will be stifled."  *Partington*, 56 F.3d at 1159.

Accordingly, under the Ninth Circuit's three-part test (*i.e.*, examining (i) broad context; (ii) specific context/content; and (iii) whether the "statement" is sufficiently factual), Plaintiff will not be able to demonstrate the requisite probability of prevailing on his defamation or injurious falsehood claims:

First, as to the broad context, because the Film is a docudrama, Defendants "have substantial latitude in describing the events involved" in the Film.  *Partington*, 56 F.3d at 1154.  This context negates any impression that the Film implies any provably false assertion of fact about Plaintiff.

Second, the specific implications alleged by Plaintiff also refute any argument that the Film makes false statements about Plaintiff.  At most, Plaintiff complains that the Film describes others' publicly-expressed opinions about Plaintiff.  The "Jerry Heller" character in the Film is not shown committing any improper or illegal actions, or even admitting that he had ever done anything improper.  Rather, the Film depicts criticisms articulated by others about Plaintiff, which Plaintiff's own Memoir concedes had been very publicly leveled against him.  *See*, *e.g.*, Plaintiff's Memoir, at pp. 8-9, 292.[17]  For example, in the scene where the Eazy E and Heller characters confront each other (Film at 02:03:21-02:05:50), the Jerry Heller character unqualifiedly defends himself and denies any wrongdoing.  *See Reader's Digest Assoc., Inc. v. Superior Court*, 37 Cal. 3d

---

[16] "Although this motion picture is based on a true story some of the material has been fictionalized."  Film at timestamp 3:26:25:19.  The "timestamp" is visible on the copy of the Film provided to the Court.

[17]  Even the cover of Plaintiff's Memoir proclaims that he has an "[a]n ear for talent and a talent for controversy."

244, 259 (1984) (defendants under no obligation to create "balanced" depiction of events or depict plaintiff's view of events).  It is impossible to conceive of a serious docudrama exploring this history that would not depict these disputes, and the First Amendment protects the right of filmmakers to tell this story.[18]

In a case with a similar fact pattern, the Sixth Circuit affirmed the lower court's dismissal of a defamation action, brought by the former manager of the singing group the Judds, alleging that an article in the tabloid *The Globe* had stated he had stolen or misappropriated the Judds' money based on language in that article that the plaintiff had "ripped off $20 million" from the Judds, had been "bleeding them dry for 10 years", "couldn't be trusted," "had betrayed and used" the Judds,  and had "pocketed most of what [the Judds] had earned." *Stilts v. Globe Int'l, Inc.*, 91 F.3d 144, No. 95-5554, 1996 WL 370142 at *1-3 (6th Cir. 1996), *aff'g* 950 F. Supp. 220, 224-25 (M.D. Tenn. 1995). The Sixth Circuit concluded the article was as a matter of law "substantially true" because a reasonable reader would understand the article was describing an undisputed "controversy that exists between the Judds and [their manager] Stilts concerning their mutual business affairs and the hard feelings between the Judds and Stilts." *Id*.

Third, as to whether any alleged "statements" are sufficiently factual such that they may be proven false, the alleged implications derived from the Film are not statements of fact at all.  As examples, whether Plaintiff was a "sleazy" manager, or a "bad guy," or was responsible for the demise of N.W.A., or had members of N.W.A. sign "unfavorable" contracts, are all expressions of opinion and not of demonstrable fact.  As discussed with approval in *Partington* (*e.g.*, at 1158-59) other Circuits have found similar subjective evaluations not to be assertions of provable, objective facts.  *Beverly Hills*

---

[18] These comments are equally applicable to other negative opinions of Plaintiff expressed in the Film by other characters in the Ruthless/N.W.A. saga, including Dr. Dre, Woods-Wright, and Ice Cube. FAC ¶ 36. The issue is not whether those opinions are "true" as Plaintiff seems to contend, but whether those opinions were held by some involved in the story told in the Film, and Plaintiff must admit they were. *See supra* at pp. 5-7, 9-10.

21

1  *Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191,

2  196 (8th Cir. 1994) ("unfair"); *Moldea v. New York Times Co.*, 22 F.3d 310, 316 (D.C.

3  Cir.) ("sloppy journalism"), *cert. denied*, 513 U.S. 875 (1994); *Chapin v. Knight-Ridder,*

4  *Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) ("hefty mark-up"); *Phantom Touring , Inc. v.*

5  *Affiliated Publ'n*, 953 F.2d 724, 728 (1st Cir.) (assertion that a stage production was

6  "fake" and "phony"), *cert. denied*, 504 U.S. 974 (1992).[19]

7       In addition, the inferences claimed by Plaintiff relate to his performance as the

8  manager for Ruthless Records, Eazy E, and other members of N.W.A. In *Partington*, the

9  Ninth Circuit concluded "that negative statements concerning a lawyer's performance

10  during trial, even if made explicitly, are generally not actionable since they are not

11  ordinarily "susceptible of being proved true or false."  56 F.3d at 1158 (quoting

12  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990)).  The same is true of negative

13  statements concerning the performance of a manager in the music business.[20]  As with

14  trial strategy, "there is a wide variation in opinion concerning the appropriate"

15  management strategies to be pursued in the music business "in a given circumstance."

16  *Id.*[21]

17       Finally, because Plaintiff in his own Memoir admits that the criticisms of him that

18

---

19  [19]  Even if Plaintiff claims that the inference that he was fired is a statement of fact, it will

20  do him no good.  He has admitted he was terminated, and that he sued and litigated for
    over two years his claim that he was "wrongfully" terminated, before settling those

21  claims and the counterclaims Comptown Records brought against him. *See supra* at pp.
    8-10. Thus, the inference that he was fired is at least substantially true, and cannot form

22  the basis of a defamation claim under California law.  *Masson*, 501 U.S. at 516-17.

23  [20]  Plaintiff has expressed some of his views on this subject.  Plaintiff was the

24  "financializer" of Ruthless Records and N.W.A. because "artists should make music; it
    doesn't pay for them to have to spend time financializing" and "being scrupulously

25  honest within the context of the music business … means something quite different from
    the context of most businesses."  Plaintiff's Memoir at pp. 103, 166-67, 226.

26
    [21]  Plaintiff recognizes as much in his Memoir, where he expresses regret about his

27  failure as the manager of Ruthless Records to keep N.W.A. together and, by implication,
    recognizes that if he had made different decisions and pursued different strategies, then

28  that regrettable outcome might have not occurred.  Plaintiff's Memoir at p. 22.

are the subject of Claims 1-3 and 5-8 were publicly leveled at him by members of N.W.A. and others and because of the 1997 litigation based on those criticisms, his only claim can be of false implications from the Film's depiction of those undisputed criticisms.  However, the Ninth Circuit in *Partington* rejected such claims as barred by the First Amendment, precluding Plaintiff from satisfying his burden of proving the requisite probability of prevailing on those claims here.

> c.   Plaintiff Cannot Demonstrate the Requisite Probability of Proving All Defendants Made the Alleged Defamatory Inferences with "Actual Malice" or That All Defendants Affirmatively Intended or Endorsed any Defamatory False Inferences.

To establish the requisite probability of prevailing on his defamation and injurious falsehood claims, Plaintiff must identify facts (and ultimately prove them by clear and convincing evidence) supporting the conclusion that *each Defendant* made the challenged statements "with 'actual malice,' *i.e.*, knowledge of their falsity or reckless disregard of their truth." *Makaeff*, 715 F.3d at 270 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 331-32, 334 n.6, 342 (1974)).  The "reckless disregard" standard means showing by admissible, clear and convincing evidence that *each* Defendant "entertained serious doubts as to the truth" of the challenged inferences from the Film.  *Id*.  Mere evidence of a failure to investigate, or of factual errors in the docudrama Film, will not suffice.  *St. Amant v. Thompson*, 390 U.S. 727, 733 (1968); *Makaeff*, 715 F.3d at 270; *Murray v. Bailey*, 613 F. Supp. 1276, 1280 (N.D. Cal. 1985); *Partington*, 56 F.3d at 1155; *Reader's Digest Assoc., Inc.*, 37 Cal. 3d at 259-65.

Plaintiff must also identify facts (and ultimately produce admissible, clear and convincing evidence) supporting the conclusion that *each Defendant* "intended to convey the defamatory meaning" of the alleged defamatory implications in the Film. *Newton*, 930 F.2d at 681.  Here, as discussed more fully in the companion Motion to Dismiss, Plaintiff does not even identify which Defendant(s) purportedly made what statements, thereby precluding him from satisfying this burden.

23

Because the Film portrays views and opinions that Plaintiff admits in his Memoir were publicly expressed by participants in the controversies depicted in the Film, and were the basis of the 1997 litigation, Plaintiff cannot satisfy his burden with respect to *any* Defendant—much less all of them—of showing both "actual malice" and that the filmmakers intended to endorse or convey those opinions as their own.

2.   Plaintiff Cannot Demonstrate the Requisite Probability of Prevailing on His Misappropriation of Likeness Claim 4.

In Claim 4, Plaintiff sues for "misappropriation of likeness" under California law because he was depicted in the Film without his permission.  However, the law is clear that Defendants did not need Plaintiff's permission to depict him in the Film.  As shown in Defendants' Motion to Dismiss, "no cause of action will lie for the publication of matters in the public interest."  *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793 (1995).

The "public interest" exception to liability for misappropriation of likeness claims is predicated on the First Amendment:  "public interest in the subject matter of [a] program gives rise to a constitutional protection against liability."  *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 542-43 (1993) (documentary film chronicling events and public personalities in the early days of surfing not subject to claim for appropriation of likeness, even though plaintiff alleged the documentary "erroneously characterizes me and contains prevarications about me"); *accord Vijay v. Twentieth Century Fox Film Corp.*, No. CV 14-5404 RSWL (Ex), 2014 WL 5460585, at *4 (C.D. Cal. Oct. 27, 2014); *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1122 (N.D. Cal. 2002).  "The California Supreme Court has subjected the 'right of publicity' under California law to a narrowing interpretation which accords with First Amendment values."  *Cher v. Forum Int'l Ltd.*, 692 F.2d 634, 638 (9th Cir. 1982) (citing *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 871-72 (1979) ("[w]hether the publication involved was factual and biographical, or fictional, the right of publicity has not been held to outweigh the value of free expression")).

24

As discussed above, N.W.A. was a wildly successful and controversial rap music group and, for three decades, there has been intense public interest in the Film's characters and their story. Films that "inform and entertain the public with the reproduction of past events, travelogues and biographies," and depict people who were part of an "era that contributed, willingly or unwillingly, to the development of a lifestyle that has become world-famous and celebrated in popular culture," qualify as "public interest" expression protected by the First Amendment. *Dora*, 15 Cal. App. 4th at 542; *accord*, *Montana*, 34 Cal. App. 4th at 793. Accordingly, this public interest exception to liability for misappropriation of likeness precludes Plaintiff from satisfying his burden of showing he has a reasonable probability of prevailing on this claim.

Nor can Plaintiff evade this result by pointing to allegedly false statements or implications about him in the Film. Where, as here, a misappropriation of likeness claim by a public figure is predicated even in part on allegedly false statements, Plaintiff bears the additional burden of pleading and proving "actual malice" as he would in a defamation claim. *Stewart v. Rolling Stone, LLC*, 181 Cal. App. 4th 664, 682 (2010); *William O'Neil & Co. v. Validea.com, Inc.*, 202 F. Supp. 2d 1113, 1118 (2002). As discussed above, Plaintiff cannot meet his burden to establish the requisite probability of proving actual malice as to any Defendant.

## IV.   CONCLUSION

Based on the foregoing, the Motion should be granted.

DATED: February 10, 2016          GREENBERG TRAURIG, LLP

By:    */s/ Jeff E. Scott*
Jeff E. Scott
Attorneys for Defendants Attorneys for Defendants NBCUniversal Media, LLC, erroneously sued as "NBCUniversal, Inc.;" F. Gary Gray; O'Shea Jackson Sr., p/k/a Ice Cube; Andre Young, p/k/a Dr. Dre; The Estate of Eric Wright, p/k/a Eazy E; Tomica Woods-Wright, individually and as the personal representative of The Estate of Eric Wright; Comptown Records,

Inc.; Matt Alvarez; Scott Bernstein; Legendary Pictures Funding, LLC, erroneously sued as "Legendary Pictures;" Xenon Pictures, Inc., sued as "Xenon Pictures, Inc./Xenon Entertainment Group;" Jonathan Herman; Andrea Berloff; S. Leigh Savidge; Alan Wenkus

LA 132458351